## UNITED STATES DISTRICT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## AT PADUCAH

| | |
|---|---|
| CINDY FLICK, PLAINTIFF | ) |
| | ) |
| v. | ) |
| | ) |
| MERCY HEALTH PARTNERS-Lourdes, Inc. | ) CIVIL ACTION NO.5:14-cv-00198-TBR |
| DEFENDANT | ) |
| | ) |

## 2nd AMENDED COMPLAINT AT LAW - REVISED

NOW COMES plaintiff, CINDY FLICK, complaining of the defendant, MERCY HEALTH PARTNERS-Lourdes, Inc. alleging and stating as follows:

1. At all times pertinent to this Complaint at Law, plaintiff, Cindy Flick, was a resident of Johnson County in the state of Illinois.

2. At all times pertinent to this Complaint at Law, defendant was a corporation duly authorized to do business in the Commonwealth of Kentucky and conducted business in McCracken County, Kentucky.

3. In January of 2011, plaintiff, Cindy Flick was hired by defendant for the position of Laboratory Section Supervisor. Plaintiff's duties included but were not limited to, oversight of a wide variety of administrative, fiscal and technical activities and ensuring the efficient operation and regulatory compliance of the clinical laboratory in accordance with the mission and values of the Mercy Health organization.

4. The Commonwealth of Kentucky safeguards the quality and safety of patient care through Chapter 205 Control of Fraud and Abuse, and through the Kentucky Patient Safety Act found in Chapter 216B of the Kentucky Revised Statutes (KRS).

1

5. Lourdes, being a hospital licensed to provide patient care in the Commonwealth of Kentucky, is subject to all applicable KRS statutes.

6. a) In March of 2013, the plaintiff first became aware that Lourdes Pathology Department was purposely holding breast tissue biopsy specimens for 14 days after patient discharge before sending them to Agendia (an outside reference lab). Agendia performs genetic testing which specifically identifies the type of cancer present and provides the physician with information needed for appropriate treatment of that cancer.

   b) At that time the plaintiff was informed by Pathology employee, Kemmerli Crass that an Agendia sales rep had instructed them to mark the box for "send and hold" on the Agendia requisition, and follow up with a signed physician order 14 days after discharge to avoid Agendia having to bill the hospital. Ms. Krass showed the plaintiff copies of presigned, blank Agendia requisitions signed by Daniel Howard M.D. to be used for that purpose. The plaintiff subsequently obtained a copy of this requisition from Debra Thomason, the pathology secretary. The presigned signature had been whited out, however a portion of the signature can still be seen. See Exhibit 7.

7. The 14 day hold on breast tissue was specifically done to circumvent the Medicare Date of Service (DOS) rule which specifies that any laboratory services performed within 14 days of an inpatient admission would be lumped into the predetermined DRG payment. This applies to tests done at the hospital or tests referred to outside reference laboratories. The hospital is essentially the broker of all services that the patient receives during that period of inpatient admission, and 14 days hence. Anything after 14 days post discharge is treated as a separate encounter and can be billed separately.

8. After holding the tissue for 14 days post discharge, the DOS became the later date. Agendia then performed the testing and billed Medicare. In this case Lourdes would not be responsible for payment to Agendia. The cost of the full profile was $9,325. If the DOS was correctly entered as the date of surgery, Lourdes would be responsible for the $9,325 payment to Agendia, but would still collect the same preset amount for the hospital stay from Medicare.

> For example if a given DRG reimbursed $12,000, and the tissue was sent to Agendia on the day of surgery, the hospital would have to pay Agendia $9,325 of the $12,000 collected, leaving only $2,675 to cover the hospital's expenses. By waiting the 14 days, the hospital would still get the $12,000, but Agendia could bill Medicare separately for the $9,325, because it would then be considered a separate encounter.

9. This practice not only violated Rule 40.8 (Rev 1515) – Date of Service (DOS) for Clinical Laboratory and Pathology Specimens found in the Medicare Claims Processing Manual, Chapter 16 - Laboratory Services, which states as a general rule that the DOS for the test must be the date the specimen was collected, but additionally this practice could adversely impact the health and welfare of breast cancer patients by delaying definitive identification of the genotype causing the tumor which directs treatment decisions. Appropriate treatment could be delayed resulting in deterioration of patient's condition and ultimate death. This practice could also contribute to pain and suffering of patients through the anxiety caused by waiting for these results.

10. This was a direct violation of KRS 216B.165 Duty to report quality of care and safety problems and prohibition against retaliation. Which states . . any agent or employee of a health care facility or service licensed under this chapter who knows or has reasonable cause to believe that the quality of care of a patient, patient safety, . . is in jeopardy, shall make an oral or written report of the problem to the health care facility or service . . (3) states that no health care facility licensed under this chapter shall by policy, contract, procedure, or other formal or informal means subject to reprisal, or directly or indirectly use, or threaten to use, any authority or influence, in any manner whatsoever, which tends to discourage, restrain, suppress, dissuade, deter, prevent, interfere with, coerce, or discriminate against any agent or employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of the health care facility or service the circumstances or facts to form the basis of a report under subsections (1) or (2) of this section.

11. In March of 2013, when the plaintiff became aware of this activity she informed her direct supervisor, Mohammad Khan, Laboratory Director. Mr. Khan denied knowledge of the arrangement, yet he made no effort to change it. In April of 2013, the plaintiff reported the practice to Elizabeth Snodgrass, the Corporate

Compliance Officer. Ms. Snodgrass told the plaintiff that she would investigate her allegations, and shortly thereafter the practice was discontinued.

12. Mr. Khan then attempted to obtain discounted pricing and requested a contract be drawn up by Agendia. He added a clause to Sec 6.4 of the proposed contract that stated "In addition (if) testing is ordered on inpatient or same day surgery, the Laboratory will waive the charges." The laboratory as defined in this contract is Agendia. See Exhibit 1.

13. In June of 2013 Agendia sales representative, Renis Baker, met with the plaintiff. He informed her that he was having a problem with Mr. Khan. He said that Mr. Khan was insistent that a clause be added to the contract specifying that services provided to certain patients be provided at no charge. He also stated that Lourdes had approximately $34,000 in unpaid bills to Agendia, that had been outstanding for more than 6 months, and that Mr. Khan refused to discuss the problem with the contract, or to pay the outstanding bills. On or about July 30, 2013 Mr. Baker sent the plaintiff a copy of the proposed contract via email.

14. The plaintiff went to Mr. Khan on or about July 30, 2013 to advise him that she thought the stipulation regarding free services should be removed from the contract. She told him that it was a potential violation of Anti-kickback regulations to request or accept free services. Mr. Khan responded that it was none of her business. The plaintiff followed up with an email dated July 30, 2013 to Mr. Khan in which she states .. "I have a concern with section 6.4 regarding the last statement that they will waive the charge for medicare inpatients or SDS patients. They cannot give us testing at no charge, it is the same as giving us anything else of value, it is seen as an inducement to use their lab. That statement needs to be removed." See Exhibit 2.

15. A representative from the Agendia accounting department, Vicky Reyes, also contacted the plaintiff several times regarding the outstanding bills, by phone and by email. The plaintiff reviewed the patient accounts in question to determine which patients were billed by the hospital and if payment had been received. During the course of this investigation she discovered that Agendia had already written off approximately $14,000 worth of services on two patients, one of which Lourdes had billed Medicare for.

16. The plaintiff sent an email to Ms. Reyes on Aug 22, 2013 asking why the charges had been credited for these two patients.  One patient with DOS 7/2/12, the other with DOS 9/17/12. The patient with DOS 9/17/12 had received a full Mammaprint and Blueprint profile that should have been billed at $9,325.  Ms. Reyes responded in an email reply on Aug 22, 2013 "They were credited off as we felt they had fallen through our procedure thus we did not want to penalize the hospital for the charges."  In separate conversation later that day, the plaintiff verified with Ms. Reyes that the procedure she was referring to was the 14 day hold which would have allowed them to bill Medicare directly. See Exhibits 3 & 4.

17. The plaintiff then accessed the patient's account who received services on 9/17/12 in the Lourdes Billing System.   She was a 79 year old patient, primary payer was Medicare.  There were charges entered for the services performed by Agendia as follows:
    - 23130 Morphometric Comp       $362.50
    - 23131 Morphometric Disc         1450.00
    - 23132 Morphometric in situ       502.84
    - 23171 Morph in situ dist            630.00

18. Mr. Khan, as laboratory director, **had the authority to refer** tissue specimens to Agendia, as opposed to another vendor.  It was his responsibility to question or refuse the free services.  Not only did the defendant not pay for this testing, they in turn billed Medicare for Agendia's services.

19. Additionally all reference lab bills are reviewed and paid by Mr. Khan.  He should have been fully aware of any credits to the Lourdes account.

20. In Sec 6.4 of the proposed contract Mr. Khan specifically wrote "In addition (if) testing is ordered on inpatient or same day surgery, the Laboratory will waive the charges."  Inpatients and same day surgery patients include all payer types including Medicare, Medicaid, Private Insurance and Self Pay.

21. In August of 2013, the plaintiff met with Jeff Jones, Vice President of Operations who was Mr. Khan's direct supervisor. She reported that Mr. Khan had solicited and accepted free services.   She also provided him with detailed documentation including a copy of the contract with the verbiage added by Mr. Khan regarding

free services, and copies of the Agendia bills with unwarranted patient credits and hospital charges signed off by Mr. Khan.

22. The plaintiff did not receive any feedback from Mr. Jones until September 6, 2013, at which time she was advised via email, that Mr. Jones did not have time to deal with these issues, and that he supported Mr. Khan's decisions and had returned all documentation to him. See Exhibit 5.

23. On October 3, 2013, plaintiff was summoned to Human Resources at which time she was suspended pending termination. The reason for termination was given as insubordination. The counseling record stated "On 9/20/2013 Lab Director instructed Cindy to refrain from engaging in contract discussions with a vendor (Agendia). On this day she was instructed to refer all conversations or inquiries from Agendia to the Lab Director. . . . This is the latest incident in a long standing pattern of Cindy circumventing the chain of command. Ignoring the direct instruction of her director. . . The contract execution with Agendia is now in jeopardy as a result." See Exhibit 6.

24. Prior to this date the plaintiff received four separate evaluations from Mr. Khan, that all rated her as above average. Both of her annual raises were in the exceptional category, requiring vice president approval. She had received no disciplinary referrals of any kind during her tenure with the defendant.

25. Plaintiff was discharged in retaliation for trying to intervene in patient safety issues, and for reporting what she believed to be a violation of the Fraud and Abuse Statutes and Regulations as stipulated by the Federal Government and the Commonwealth of Kentucky.

26. Plaintiff was discharged in retaliation for her actions regarding Agendia including:
    a. Intervention in the practice of holding breast tissue biopsy specimens for 14 days post discharge
    b. Reporting her concerns regarding this 14 day hold practice to the Lourdes Corporate Compliance Officer, Elizabeth Snodgrass.
    c. Intervention in contract execution between Lourdes and Agendia regarding clause 6.4 added by Lab Director Mohammad Khan, requesting free services for inpatients and same day surgery patients.
    d. Reporting her concerns regarding this solicitation of free services to

        Vice President, Jeff Jones.
   e. Investigating and questioning free services provided by Agendia through the issuance of unwarranted credits to outstanding bills.

## APPLICABLE LAWS

27. The defendant violated KRS 216B.165 when they unlawfully terminated plaintiff's employment for intervening in a scheme which delayed patient testing for strictly financial reasons. KRS 216B.165 (1) states that any agent or employee of a health care facility or service licensed under this chapter who knows or has reasonable cause to believe that the quality of care of a patient, patient safety, . . is in jeopardy, shall make an oral or written report of the problem to the health care facility or service . . (3) states that no health care facility licensed under this chapter shall by policy, contract, procedure, or other formal or informal means subject to reprisal, or directly or indirectly use, or threaten to use, any authority or influence, in any manner whatsoever, which tends to discourage, restrain, suppress, dissuade, deter, prevent, interfere with, coerce, or discriminate against any agent or employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of the health care facility or service the circumstances or facts to form the basis of a report under subsections (1) or (2) of this section.

28. KRS 205.8465 Mandatory reporting of violations – Confidentiality – Prohibition against employer discrimination or retaliation states: No employer shall, without just cause, discharge, or in any manner discriminate or retaliate against any person who in good faith makes a report required or permitted by KRS 205.8451 to 205.8483, testifies, or is about to testify, in any proceeding with regard to any report or investigation. Any individual injured by any act in violation of the provisions of this subsection shall have a civil cause of action in Circuit Court to enjoin further violations, and to recover the actual damages sustained, together with the costs of the lawsuit, including a reasonable fee for the individual's attorney of record.

29. KRS 446.070 Penalty no bar to civil recovery. This statute provides remedy to any party injured by the violation of Kentucky statutes. It specifically states: A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation.

7

30. The actions of the defendant meet all of the criteria for a common law wrongful discharge tort as recognized by the Commonwealth of Kentucky. The Kentucky wrongful discharge law is clear and well established: An employer cannot discharge an employee for a reason "contrary to a fundamental and well-defined public policy as evidenced by existing law." Well-defined policy includes the Commonwealth's criminal laws. The Kentucky Supreme Court found for plaintiffs in two historic wrongful termination cases, *Firestone Textile Co. v. Meadows, 666 S.W.2d 730 (KY 1984)* and *Grzyb v. Evans, 700 S.W.2d 399 (KY, 1985)*

Citing *Grzyb v. Evans, 700 S.W.2d 399 (KY, 1985)* We embraced Brockmeyer v. Dun & Bradstreet, 335 N.W.2d 834 (Wis. 1983), to establish the limitations on "any judicial exceptions to the employment-at-will doctrine." 335 S.W.2d at 835. They are:

1) The discharge must be contrary to a fundamental and well-defined public policy as evidenced by existing law.

2) That policy must be evidenced by a constitutional or statutory provision.

3) The decision of whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact.

*Brockmeyer v. Dun & Bradstreet,* 335 N.W.2d 834, 835 (Wis.1983), considers whether to permit "any judicial exceptions to the employment at-will doctrine." The Wisconsin Supreme Court concludes "that in the interests of employees, employers and the public, a narrow public policy exception should be adopted," and then adopts the following rule:

"(A)n employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law. . . The public policy must be evidenced by a constitutional or statutory provision. An employee cannot be fired for refusing to violate the constitution or a statute. Employers will be held liable for those terminations that effectuate an unlawful end." 335 N.W.2d at 840. 666 S.W.2d 732

Case 5:14-cv-00198-TBR-LLK   Document 35   Filed 02/06/15   Page 9 of 10 PageID #: 357

The plaintiff has met all of the above criteria and is entitled to remedy including but not limited to compensation for lost employee wages and benefits, reinstatement in her position, punitive damages and reimbursement of legal fees.

## PRETEXTUAL REASON FOR TERMINATION

31. Plaintiff was terminated for insubordination which is deemed an "intolerable offense" by the defendant and subject to immediate termination. Plaintiff asserts that other lab employees were not held to the same standards. The policy on intolerable offenses also lists solicitation and personal internet use. These were both common place occurrences in the lab, as can be attested by numerous lab employees. Additionally the plaintiff is aware of two instances of direct insubordination involving Mohammad Khan and other employees for which no action was taken. In one instance, employee Michelle O'Neal was asked by Mr. Khan to look up a patient report that he wanted for personal reasons. She refused on the grounds that it was a HIPAA violation.

32. A second instance involved Darrell Burnett, an evening shift employee who did not complete the required annual microbiology competency by 12/31/12 as required by regulatory agencies. Plaintiff reported this to Mr. Khan who in turn instructed Mr. Burnett to complete the competency with deadlines given. These deadlines came and went, and Mr. Burnett still failed to do the competency. Plaintiff complained to Mr. Khan at least two more times, each time which he stated that he had given Mr. Burnett a deadline. At the date of plaintiff's termination, ten months later, the competency was still not done, and no action was taken against Mr. Burnett.

33. The one lab employee that was actually fired was Marzie Miller, who had been receiving disciplinary write ups for over ten years, many for serious patient errors. She received numerous verbal warnings, written warnings, suspensions and remedial training opportunities before being terminated. None of which were offered to the plaintiff.

34. The treatment of the plaintiff was significantly disparate from that accorded to other lab employees for similar or more serious infractions. When coupled with evidence of temporal proximity, causation may be inferred when a supervisor who is aware of a protected activity treats the plaintiff differently than other

workers. *See Garg v. Macomb County Community Mental Health Services,* 472 Mich. 263, 287-88, 696 N.W. 2d 646, 661 (2005). Applying federal law and holding that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation (citing *Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 230 (6th Cir. 1987)

35. By wrongfully discharging plaintiff without reasonable cause or justification, and for the retaliatory reasons set forth above, defendant violated the public policy of the United States Government and the Commonwealth of Kentucky.

36. WHEREFORE plaintiff, Cindy Flick, prays for judgment against defendant for all proper compensatory damages, special damages and punitive damages in favor of Plaintiff as a result of Defendant's retaliation and retaliatory discharge of Plaintiff including but not limited to the following: back pay, loss of pension, health and other employment benefits; future pay until age of retirement; compensation for all special damages, including emotional distress, mental suffering and anguish; humiliation; damage to reputation; plus attorney's fees and costs and such other relief as the Court deems just and proper, as a result of Defendant's retaliation and wrongful discharge.

**DEMAND FOR A JURY TRIAL**

_____
Cindy Flick, Plaintiff
1890 Old Metropolis Rd
Vienna, Illinois 62995